Albert G. Boesel v. Commissioner.
Albert G. Boesel v. Commissioner
Docket No. 31037.
United States Tax Court
1952 Tax Ct. Memo LEXIS 81; 11 T.C.M. (CCH) 950; T.C.M. (RIA) 52284; September 24, 1952
William B. Shealy, Esq., 30 Broad St., New York, N. Y., for the petitioner. William G. O'Neill, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency of $21,637.54 in petitioner's income tax for 1945. Petitioner no longer contests certain adjustments. The issues remaining are: 1. Whether petitioner sustained a deductible ordinary loss of $28,400 in 1945, undersection *82 23 (e) (2), on an abandoned contract claim. 2. Whether petitioner is entitled to a deduction for business expenses in 1945, under section 23 (a) (1), in excess of the $1,750 allowed by respondent. 3. Whether petitioner's purchase of certain stock was a transaction entered into for profit, under sections 23 (e) (2) and 117 (e), entitling him to a net long-term capital loss in 1943 when the stock became worthless, and a consequential carry-over deduction in 1945. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner is an individual stockbroker and financial promoter. He resided in New York during 1945 and all prior years relevant to this controversy. He filed his 1945 return in the second collection district of New York. Issue No. 1 The Missouri-Kansas Pipe Line Company, hereinafter called Mokan, was a Delaware corporation organized in 1928 to finance and construct facilities for the production, transportation, and sale of natural gas through Kansas, Missouri, Indiana, and Michigan. It was not an operating company. It was a holding company owning shares of stock in various operating companies. Mokan was *83 neither authorized nor qualified to do business in New York, nor did it maintain any office or place of business there, during the years relevant to this controversy. Frank P. Parish & Company, Inc., was a Delaware corporation organized in 1929 to market and distribute Mokan's securities. Frank P. Parish was president of the Board of Directors of both corporations from 1929 to 1937. In or about March 1930, petitioner and Parish negotiated and executed a written agreement whereby petitioner promised to subscribe to 5,000 shares of Mokan common stock, $25at per share. The subscription price of $125,000 was to be paid in 36 monthly installments. Under the terms of the contract, no right to delivery of the shares arose until the three-year period of payment expired. Parish executed the agreement in Chicago, on behalf of Frank P. Parish and Company. This agreement was subsequently acquired by Mokan. Petitioner executed the agreement in New York. The Board of Directors of Frank P. Parish & Company had authorized the negotiation of this type of agreement with employees of Mokan. Such subscription contracts were intended to provide special incentives to employee investment by offering *84 a subscription price below the market price at that time. Petitioner had never been an employee of Mokan or Frank P. Parish and Company. In October 1930, petitioner defaulted in his payments, after having paid a total of $28,400. He was assured by Parish that he would either get his money back or its equivalent in stock. In February 1932, petitioner and Parish discussed an arrangement in New York, whereby petitioner was to be released from any further obligation and Parish was to deliver "promptly" 1,136 shares of stock, representing the amount paid by petitioner. Mokan had followed this procedure under all employee subscription contracts. On March 18, 1932, before delivery of the stock which could not be accomplished until March 1933 under the subscription agreement, Mokan went into receivership by decree of the Chancery Court of Delaware, to which it consented. Parish was aware of the probability of a receivership before that date. He also knew that receivership would deprive him of any right to issue or to agree to issue stock to petitioner. The receivership was not in process at the time of the February discussion between Parish and petitioner. Mokan was solvent at the time *85 that the receivers were appointed, in the sense that its assets exceeded its liabilities. The value of the assets turned back to Mokan in 1937, together with the receivers' record of debts paid, indicates that it remained solvent during the receivership. Receivership was undertaken to protect Mokan from monopolistic efforts by other members of the natural gas industry to squeeze it out as a competitor. Suits for damages under the Sherman Act were undertaken by Mokan as a result of these same practices by its competitors. Mokan showed a continuously increasing equity for shareholders from the end of the receivership to the time when its directors formulated their liquidation plan in 1944. The receivers never acknowledged petitioner's claim nor gave him any reason to believe that the stock would be delivered to him. They considered litigation against petitioner for the unpaid balance of the original subscription agreement. After the assets were returned to Mokan by the receivers in September 1937, Parish was ousted from the presidency after a proxy fight, and his successor refused to deliver the shares to petitioner. In March 1944, Mokan embarked upon a plan to liquidate and distribute *86 its assets, consisting of stock in operating companies, to its shareholders in exchange for their Mokan shares. It sold some of its shares in order to eliminate its secured indebtedness. Detailed opinion of tax counsel was sent to stockholders to indicate the tax benefits of their participation. Mokan hoped to complete the exchange by early 1945, but the privilege of participation was later extended into 1946. After the Mokan Plan was adopted, in 1944, petitioner's counsel held conferences with counsel for Mokan to negotiate a release by Mokan of its unpaid balance claim in exchange for petitioner's release of his claim for delivery, but no encouragement was obtained. Early in 1945, petitioner conferred with Parish about the advisability of suing Mokan. Parish persuaded him that the cost of such litigation, in the light of his own experience with Mokan, would probably exceed the value of his claim. Petitioner never brought suit against Mokan or against Frank P. Parish & Company. At the end of 1945, Mokan had assets of $5,857,418.93, liabilities of $5,277,496, and a surplus of $454,754.82. The net assets of Mokan not subject to the liquidation exchange plan were $15,431.82. From *87 1930 through 1944, petitioner's income did not exceed $30,000 in any one year. But in 1945, it exceeded $55,000. No change in the value, if any, of petitioner's claim to the Mokan stock took place during the year 1945. Issue No. 2 In 1945, petitioner was a partner in the stock brokerage firm of Merrill Lynch, Pierce, Fenner & Beane. He also promoted security underwritings on his own account and sold them to other firms, after first offering the "deal" to his own firm. He had an office at 70 Pine Street, in New York City, where he spent 8 to 10 hours daily, except when he traveled in the course of his business, which was on an average of 3 days per month. Petitioner became a professional director of Simplicity Pattern Company, and worked for two years on a merger of five independent automobile companies, which was consummated in 1946 and resulted in a cash commission to petitioner of $150,000. All this required extensive travel and entertainment expenses. Petitioner purchased a Packard automobile in July 1945, at a cost of $1,987.57, which he used partly in his business. Petitioner did not use his automobile on all business trips, but he did use it at times in driving to and *88 from his office. He used his automobile on a vacation trip in 1945, during which he drove an average of 100 miles a day for one month. Petitioner was a member of various New York clubs, including the Union League and Wall Street Clubs, at which he entertained customers. He also expended sums outside of clubs to entertain customers and business connections with whom he was promoting transactions for profit. Petitioner claimed a total business expense deduction of $3,803.24 in his 1945 return. A summary of petitioner's claimed expenses follows: Entertainment at Clubs, net of firm re-
imbursement and estimated personal
expense
$1,800.93
Entertainment of customers outside of
clubs - hotels, at home
795.58
Union League - cashed personal checks,
estimated 1/4 for business entertain-
ment and 1/4 for travel and other busi-
ness expense incurred by use of his
automobile for business purposes
1,187.50
Flowers, theater tickets for prospective
clients
187.08
Other business expenses (magazine and
financial paper subscriptions, etc.)
98.90
Telephone, telegraph, auto depreciation
and servicing estimated as attribut-
able to business expense
938.14
TOTAL
$5,008.13
*89 The Union League Club had a system of cashing personal checks for its members. At the parties held by petitioner, not all guests were business acquaintances. Some were personal friends. Petitioner did not lunch with business acquaintances on all occasions at the Wall Street Club. Sometimes he lunched alone. Petitioner kept no exact record of his business expenditures on his automobile, entertainment, and other business expenses. Issue No. 3 In 1933, petitioner and others organized the Orchard Lake Development Corporation under the New York Stock Corporation Law for the stated purpose of buying, owning, and dealing in interests in real and personal property for business purposes authorized by New York law. There were approximately 27 stockholders at the time of its dissolution in 1944. Petitioner acquired a total of 144 shares of preferred stock and 18 shares of common stock between 1934 and 1939, at a total cost of $16,000. The corporation acquired about four square miles of timber lands in Sullivan County, about 125 miles from New York, for the primary purpose of exploiting its timber resources and developing the lakeside area as a summer resort. Its initial acquisition *90 consisted of choice hunting and fishing locations owned by the defunct Orchard Lake Club. Petitioner had been a member of the Orchard Lake Club since 1914. He liked the place and went there regularly as he enjoys fishing. Petitioner had to purchase a qualifying share in the Club in order to gain the benefits of its facilities and privileges. He sometimes took business associates or prospective clients there, as it was conducive to business consultations. The business corporation set up in 1933 bore no relation to the Club from which it acquired various lands. Its purpose was not that of a club but of a real estate development. The corporation obtained most of its income from the sale of hunting and fishing licenses, the sale of some timber, and room rentals. Licensees were designated "the Trout & Skeet Club of New York," but were actually individual licensees of the corporation, rather than members of a distinct organization. Petitioner used the facilities of the corporation as a licensee, paying a fee for that privilege. The corporation filed all required tax returns for fiscal years ending November 30, 1934, through November 30, 1942, with the second Federal collection district *91 of New York and the Department of Taxation and Finance of the State of New York. For some years prior to April 1943, the West Acres Trading Corporation of Stephentown, New York, held a first mortgage on the Development Corporation properties. A second mortgage was held by petitioner. The first mortgagee instituted foreclosure proceedings in April 1943, and a judgment directing sale in foreclosure was duly entered and filed the following month. The proceeds realized from the sale were insufficient to satisfy the first and second mortgages. Therefore, the Development Corporation, left wholly without assets, ceased to do business. Petitioner reported a long-term capital loss of $16,000 in his 1943 return, representing his stock investment in the corporation, deducting a net long-term capital loss of $8,000. He claimed a carryover deduction of $1,000 in 1945, based on this loss. The internal revenue agent disallowed this claimed loss after an audit of petitioner's 1943 return, and the agent in charge notified petitioner of the disallowance in a letter dated October 28, 1947. Petitioner also took additional losses in his 1943 return arising out of the worthlessness of an open account *92 loan made to the corporation and from the sale of his second mortgage. These losses were fully allowed by respondent as claimed. Opinion I. It seems clear there was no identifiable event in the tax-year, 1945, affecting the value of petitioner's claim to the Mokan stock. See , affd. (C.A. 7) . The most that he himself says of that year is that he then decided to abandon the claim. But if it had already become worthless, that would not be an adequate ground for allowing the loss - , certiorari denied, . One most definite conclusion is that the claim had become worthless many years before - probably not later than 1937 when the change in management took place. It is even doubtful whether the claim in a legal sense ever had any value, at least in excess of the threatened counterclaim against petitioner. There is not even adequate proof that the Statute of Limitations had not already run. But if it was so evident in 1945, when the stock itself appeared to be attaining some significance as an asset, that any recovery would *93 not justify the costs of litigation, it must have been at least as much so in the earlier years of receivership and unfriendly management. We have consequently found the facts in accordance with our view that petitioner's burden of proving his claim was not worthless prior to 1945 has not been met. , affirmed (C.A. 8) . If we should conceivably be mistaken in this respect, it is still true that the claim appears to have had as great a value at the end of 1945 as at its beginning. And petitioner has entirely failed to show any overt act of abandonment which is a necessary accompaniment of intent in arriving at that result. , certiorari denied, . On this issue we consider respondent's action correct. II. From petitioner's own figures it is evident that he has overestimated his deductible business expense. No better guide to the proper deduction appears than respondent's determination. This is not a case like , where nothing was allowed. For all that appears in the record, *94 the figure computed by respondent is the correct one and we have so found. On this issue also we conclude that petitioner has failed to sustain his burden. III. The loss sustained by petitioner in the Orchard Lake Development Corporation should have been allowed. That it was a transaction entered into for profit adequately appears and that is the only ground for the disallowance. Respondent himself seems to concede a business relationship between petitioner and the corporation in his action on other phases of the investment. In this respect the deficiency was erroneous. Decision will be entered under Rule 50.